Good morning, and may it please the court. My name is Matt Kinney, and along with co-counsel Brent Blater, we represent the appellants and the petitioners, Wild Equity Institute, and the Sierra Club, and these two unrelated cases. Now, what these cases involve is whether EPA has to comply with the Fish and Wildlife Service's request to re-initiate consultation over the effect of the species in the critically endangered, and in very few numbers, lands that will mark a butterfly at the end of the act as a wildlife refuge. Now, what we'll request is a very simple and ordinary request. Simply have one agency engage in consultation with the Fish and Wildlife Service. This is something that happens all the time. Simply figure out if there is something that can be done to make better the situation where the nitrogen emissions from the power plant are corrupting the soil at the dunes and endangering these three species. I'd like to start with a citation that I provided to opposing counsel in court this morning. It's a section of the Clean Air Act that relates to the notice of supplemental authority filed last week by EPA related to whether EPA has approved the state implementation plan of the Bay Area Air District. And that citation is 42 U.S.C. 7410 K3. In K4, it governs what happens when there's a partial approval of a state implementation plan and a partial disapproval. And as the notice provided by EPA stated, it was a partial approval and partial disapproval in that section plainly states the plan revision shall not be treated as meeting the requirements of this chapter until the administrator approves the entire plan revision as complying with the applicable requirements of this chapter. So, the federal implementation plan is still in place. And I cite that. So, section 4 deals with conditional approvals, which this was not. It was a partial approval, partial disapproval. And there are, issued approvals are also allowed, but only if conditions these are fixed within 12 months. And EPA gave the Air District 24 months so that that section doesn't apply. So, we do have a... Let me see if I can... I'm having trouble getting my head around. I'm sure that these cases, because of the procedural complexity, and I guess I've never seen the question, what do you mean by the consent decree? Is it a final agency action for purpose of review? I'm finding myself struggling with both of the cases. But on this one, I'm trying to figure out just sort of step one, two, three. You're seeking re-initiation, is that what you're seeking? That's correct, Your Honor. Re-initiation of what? Endangered Species Act Consultation. So, is it a re-initiation that suggests that it already happened and you're trying to re-initiate? Do you need to have some active process? For example, the initial approval, there was consultation. Yes, sir. Are you saying that we are trying to reopen that, or are you trying to reopen, re-initiate something else? I want to say that I want to reserve three minutes for rebuttal. I think I forgot to do that. Re-initiation of consultation isn't necessarily a re-opening of the previous process. It's essentially a second consultation that happens based on one of the four factors in the re-initiation regulation, the 402.16 regulation. So, you know, one of those triggers is if a new species is listed in the affected area. So if that had happened, which is not this case, you would have a new consultation that would look almost entirely different because you'd be talking about the effects of this new species that had been listed, whereas maybe before it only addressed different species. The one we're dealing with, the trigger we're dealing with here, is the emergence of new information. So the Fish and Wildlife Service, after the initial consultation, where it really just looked, it didn't understand how many nitrogen emissions would harm the dunes. That understanding was not there. So it signed off on the original permit for the power plant and said everything is fine. But then the original permit contemplated, or whatever the implication was, contemplated the amount of nitrogen emissions that we're now experiencing. So the issue that you're saying is we understand it better now. It's not that there are more than now that are coming out that we just anticipated. That's correct. So the unreason of the plan remains more or less as anticipated. That's right. And so when this new information came out, you're asking about what the process is because they didn't even really think to worry about nitrogen deposition at the sand dunes. That issue was looked at. So when you reinitiate consultation, in this instance, it would be like a new consultation focused on the nitrogen emissions rather than some of the other construction impacts that it was looked at before, such as on the fish species due to the flood. It sounds like you're then saying that it was the 2001 permit was the agency-locked action that authorized the operation of the plan, which now gives rise to this change in circumstance causing the initiations that arise. Is it too late? My question is, was the agency action that authorized the operation, it gives rise to this? Yeah, that was the initial agency action was the PSD permit that was granted at that time in 2001 was the initial affirmative agency action that triggered the need to initiate consultation on the first place. And expire. Correct.  Prior to construction of the plan. And, in fact, the APA takes a position that it didn't authorize because this was the purpose of the 2001 Civil Enforcement Action. So what agency action authorizes the plan that gives rise to the NC report? Well, that comes back to the fact that an action doesn't have to be an affirmative action of the agency for purposes of reinitiation. The BSA applies anything authorized, funded, or carried out by the agency. Permits are carried out. Authorized includes private action. So in the Crook Tribe case authored by Judge Fletcher, it talks about how private activity, in that case mining, private mining on federal land, is an action under the Endangered Species Act that's authorized by the agency. So those admissions. I actually did write that opinion. You're correct, but you're not quite correct in summarizing it. I don't think I wrote what you just said. I wrote that there was private activity, but the agency action was not that activity. The agency action was giving permits to that environment activity. But I think you're on it right. You know, Farvey is going to be the characteristic of what you said, but a lot of the phrases I think they used in the case was agency action is very broad and can include private action, private activity authorized by the federal agency. So I said, well, what if I wrote that? I wrote that it's an Endangered Interpretation, and you just gave it. I was mistaken. You didn't say private activity is not an agency action. Agency action approving or permitting the environment activity is agency action. Okay, but the term action under the Endangered Species Act includes any action authorized, funded, or carried out. So, actually, this case, what you're saying is authorized by a federal agency and that would guard the initiation of consultation. What was the agency action? Well, the action for purpose of the definition of the Endangered Species Act are the emissions from the power plant that were authorized by the PSD permit of the EPA. And sure enough, for initiation of consultation, an agency has to have taken an affirmative step. Otherwise, it would never get triggered in the first place. That affirmative step was the authorizing of emissions by issuing the PSD permit. So both of those permits get expunged. But the emissions continue, and that can't be an action under the Endangered Species Act authorized by the agency. So once the bill is issued now, that supports the proposition that even though the permits that authorize the act have expired, there can still be no action sufficient to trigger PSD applications. That's where clauses use authority to support that proposition. Well, I don't know if it would be the conduit case, but there we have an instance where the U.S. Forest Service issued land management plans and was done with those plans. They were done. There was no ongoing action. But those three, I don't think that's an analogous circumstance because those plans are long-term. This was a finite granting of PSD permit. The forest plans are different now because they're by bill condition long-range, and specific projects are done under the umbrella of those long-range plans. I'm not sure that's a good analogy. Well, the reason I think it's applicable is because, like land management plans, here we have a federal implementation plan. The EPA oversees it, still oversees it. It's still in place now. It certainly was in place when all these decisions were made. It is EPA's role, and it's part of the delegation agreement, allowing the state to implement the federal implementation plan. EPA said we have to ensure our non-delegable duty to comply with the Endangered Species Act and to carry out consultations. So it really is the same because they still have control over this federal implementation plan that they have to conduct Endangered Species Act consultations over. I'm just not sure I understood this case. So let me do a bit of a sort of a simplification. I assume that the only accident we had issued here is the initial official agreement. The permit expires. The plan was built in accordance with the permit. I'm now deviating from the actual facts, and we're now operating the plan, and it turns out, in the judgment of some of the people in Fish and Wildlife, it turns out that the actions and ambitions, which are the same that have always been contemplated, but we now know, or at least the Fish and Wildlife Service says they know, that they're having much worse consequences for these endangered species than previously anticipated. What authority is there to ask for re-initiation and consultation? Where does that authority come from? That authority comes from the federal regulation, the 40 CFR 40216, and it's important to note that in cases in which there's been a re-initiation of consultation in that circumstance, whether it's his own permit or it was granted construction or a pursuant to the permit has taken place, and now some of them, after the fact, we learn, oh, you know what, it may be worse than we thought. Do we have a case in the wild for re-initiation? I'm not sure which case. Yeah, let me see if the turtle... Yeah, the Turtle Island 1 case from 2003 was a re-initiation case where I understand that NRDC versus Joel, that was one where there had been fishing permits granted by the fisheries agency. Permits were granted, they were done, but the court said the ongoing effect on these permits, there's still fishing going on as a result of these permits, and that supports that there is discretion for the agency to act, but those were ongoing permits. That is to say, you needed a permit to fish, and without a permit you couldn't fish, so there was an ongoing permit. This is a permit to build, and the building takes place. Permit expires on its own terms, but under my hypothetical, the building took place within the period of the permit, so is that a distinction? What do I do with it? Well, the thing I should say is that the PSD permit did expire because the company failed to construct at the right time. Well, it wouldn't have expired in any event. It's just that my hypothetical is that the construction took place within the period allowed by the permit. But it's not just a construction permit. You need it to begin construction, but it has air emissions limits that get carried forward indefinitely. They get put into the permit to operate. They get put into the Title V permit, and those provisions, which are in the record, are all air, all those nitrogen limitations, and the agency still has the discretion, and that's all it needs. If you look at the re-initiation regulation, it doesn't say, is there some ongoing action, but I'm going to say there need not be. It just says, is there a discretion to act, and the EPA has not done it, but there is, and two is one of the triggering events of it. I see. All right. I'd like to understand. You'll have a little time. Thank you. Good morning. I'm in case court. Brian Toth, Department of Justice, representing the EPA. I'd like to help the court untangle the confusion that it's finding here, and just by straight off to say, I'm going to say that the evidence we're arguing for here is, unlike any other case that this Court has seen, is an extension of the case law in an unprecedented way. It's an ongoing text of the statute, as well as the text of the regulations, and this Court's case law, moreover, doesn't support a distinction between re-initiating consultation and the original act of consultation. So let me start with my sort of small-minded hypothetical that starts out with the facts of this case, but then veers off from them. Let's assume that we have the 2001 permit. Prior to granting the permit, there was consultation. Nobody could test that. And the permit is granted based upon that consultation. The counterplate is built in the period allowed during the permit, and the erasers take place as contemplated in the permit. Let's assume the erasers are no greater than they otherwise would have been, so everything looks good, until, I don't know, five years down the road, we get, and I'm not hypothesizing, convincing evidence that the nitrogen emissions from the plant are having an adverse effect that was not previously understood, and it's a fairly significant effect. Is there no obligation on the part of the EPA to re-evaluate the permit and to consult based upon this new information? There's none. It's more efficient to take that and distinguish the Turtle Island case. So those were permits, that was an ongoing permitting program, but isn't that just a distinction without a difference? That is to say, it's an ongoing permitting program. I mean, you need the permit to fish, but this is ongoing activity pursuant to a permit that was granted. Right, well, I would point the court to it. I mean, there is a distinction in the court's case, and I'll make no mistake that California sport fishing, I think, is more resembling the EPA situation here. There, there was a hydrogen-powered license that was granted, and at some point, we needed a term of the license, so information arose about effects of generating a power on the fish species, and so the court held that there was no obligation to insult because it was essentially first discretion whether to reopen the permit that was granted, and then the court said that discretion in the reopener clause of the permit wasn't sufficient federal action to give rise to a consultation duty. And so here we have it. I didn't understand what was the name of that case. It was the California Sport Fishing Agency. You should have seen the transfer. So there are cases where permits are granted, and that's the end of the story. And further activity by the private party in California sport fishing, it was the private operation of the hydropower facility. Here it's the private non-governmental operation of the natural gas burning facility that produces emissions in California sport fishing. I mean, those emissions were not acceptable to the agency. It's agency action. Well, but let me keep you up-to-date. That's why I exist again. I've gone back with this case. But the emissions that we're now seeing under my hypothetical effect that I'm trying to make an artificial claim are exactly the emissions that were approved by the agency. It's just that we now know that those emissions have much more severe and adverse consequences for the endangered species. So you're saying that the permit that approved this was supposed to be a government-wide agency action, but it is no longer agency action. It's just that the percentage of these emissions were approved by the agency. Right. It turns into unexercised discretion by the agency. And, of course, these laws consistently make the distinction between action and inaction in this context. The whole thing is in western watersheds in San Francisco, which involve the prior grant of a right-of-way to divert water. And other cases indicate that where the agency merely has discretion to act, a suit under the ESA cannot be brought to compel it to take that action. It doesn't matter what the ESA law. Now, the United States may have another option under Section 9 of the Endangered Species Act regarding a taking suit if there is indeed new information that shows the effects on a plant previously studied would in fact take species that are particularly in the butterfly when the plants are subject to the taken prohibition. Then the United States can institute a Section 9 similar to an enforcement action or a criminal misdemeanor suit. But that by itself may be another option to get at the underlying problem of this case as being harmed. But it's not an option that the physicians you have can bring against the EPA here. They can bring it against Pacific Gas and Electric if they have enough evidence to support their claim. The criteria for taking, even if there's something, there's probably a really different criteria than those that are exercised in the consultation process. That's right. And I would just point the court back to the limits of the statute. I mean, Section 9 is quite broad. You know, the take prohibition is quite powerful. By contrast, Section 7 has the limit of agency action.  The statutes, they've authorized, financed, or funded, or carried out. But they're all denominated in the statute as agency action. The re-enactment regulation implements Section 782 and it has to be understood through the lens of that statutory term, action. And so whatever, you know, whether we all might think that it's better policy than new information could inform an additional agency decision, Congress has made the judgment that under Section 782, if there's no federal agency action, then that's the end of the story. Mr. Weiss, you're a watershed in recruitment. I've also talked about affirmative action, but the agency in here, the agency took affirmative action in 2001. You said the part of it that's just like you pointed out, if the plant is still producing the same amount of pollutants or whatever chemical you want to call it, the pursuance of that permit, even though the permit expired, is it your position that because the permit expired, there's no longer agency action to authorize that? Here it expired because the plant wasn't constructed in time and then was constructed. And so the plant was in violation of the permit. The permit is the, yes, the agency action was completed. The permit issuance was completed upon issuance of the permit. That's California's fourth issue. The plant expired. I mean, that definitely would be at EPA's discretion to continue to regulate under that permit. What it did have the authority to do was to do a civil law enforcement action related to the air addict. And that's what it did here, and it obtained substantial reductions in emissions of nitrogen oxides, alpha pollutants, through its enforcement power of the air addict. Maybe I'm misunderstanding your answer to my question, which is a little complicated. In my opinion, you can't, while there could be some flight to the 2,000-foot permit, ask the agency action to authorize this, which means there is an agency obligation to support this. And no longer is that off limits to you because the permit expired? That's off limits to them because it expired, even though they were producing and operating pursuant to that permit. That's right. I mean, the emissions by themselves, again, California's fourth issue, which I think makes this clear, are non-agency action. Then operation of the power facility is being carried out by a private entity, not by the government. And you can contrast this to the cost of speaking court case in TVA, where the dam, the issue there was being built by the Tennessee Valley Authority, a government corporation. The fact that it had been appointed before the Endangered Species Act was passed didn't matter because the government corporation still was yet to fill the reservoir behind the dam and finish construction and operate the dam. So that type of ongoing federal action, it's much more apparent that those strictures of 7A to continue to apply. I think at this point, unless if we're asking other additional questions. Let me ask you, there was a bit of a dispute in the papers about the law language's argument that, well, your position is that the case shall be in progress if the Clean Air Act's 60 days is the Court of Appeals. Equity response would have conditions changing on that 60-day period. So part of our making these arguments is also sort of to figure out exactly what action they're challenging and what claim they are bringing here. So if the Clean Air Act says that if it's a final action by the Administrator of EPA, it has to be reviewed in the Court of Appeals directly with a petition for review. And as far as the actual limitations for 60 days, there is this question if it's a new information claim under the ESA, it must then be brought here. I think a way to approach this is the way the D.C. Circuit has done this in the distract cases, the Telecommunications Research Action Committee, by using the All Writs Act as a protected means of protecting the Court of Appeals jurisdiction. In other words, if what happens at the end of the day, through consultation, is an action by EPA, either a statement saying, no, we are not going to make any further changes to any regulation of this facility, or some action doing something, I don't know what they could do, but neither of those is an action. And the Courts of Appeals can still entertain direct actions under the All Writs Act, original actions in this Court, to protect their jurisdiction when it comes to an actual agency action. So that's one possibility for the jurisdiction. But as far as I am concerned, I've detailed the consent decree. The consent decree basically authorizes continued operation of the plant, even though billed to the federal agency. Yeah, legally. Now, is the consent decree, as you were saying earlier, Tom, so is it as clear as that as agency action? I don't think you can here for a couple of different reasons. First of all, I'll teach you a little bit with the premise of your suggestion that the consent decree is authorizing the emissions. I mean, it's essential, and one of the essential things that the consent decree did was require Pacific Gas and Electric to go and apply for a state law permit, not an EPA or Clean Air Act permit, but a state operating permit under state policy. We will operate and lower emissions for NOx, for carbon monoxide, et cetera. And the consent decree also embodies that it will not pursue that enforcement action any further. So it's like agency action. We could do this, but we won't. It's essentially an agreement that will enforce the demands, and ultimately that consent decree is approved by the court. I understand. So that's in other directions. Why is not agency action? That's a confusing term. That's just not right. You just put it in there. You just say that they're going to sign off on something. It's basically a settlement that's approved by the court. And the answer to agency action is agreed to hold off enforcement actions. That's another direction of thinking. That sounds like an agency decision that allows the consent decree to be selected, but we have to approve both of them. We're not going to. Why is that not agency action? So it really has to play, what you said, about an agreement not to pursue certain enforcement actions. I mean, the government's exercise of civil enforcement insurrection is the classic virtually unreviewable decision by the United States, by the federal government, to decide not to prosecute because typically they're virtually unreviewable. And to allow the plaintiffs to use the Indigent Species Act to essentially compel the agency to act differently there would undercut that strong policy. Does anyone else have anything further? Can we ask the district courts, the district agencies, to jump in on one of these issues? First, I'd like to just point out that the PSD until PSD permits expire, either get reissued or their terms get incorporated into permits that operate. And we have that in our excerpts of record, page 36 through 39. You see the PSD provisions regulating the nitrogen emissions. Those regulations of what the plant can emit do not disappear. We're now operating under different emissions. Delay or change, as you say, of the emissions that were originally authorized by Canada are now no more because of the consent decree. That's right. And regarding the consent decree, there is no dispute that there is discretion to revisit it. And, again, those are the only two questions that need to be addressed under 50 CFR. Is it 40 performs during 50 CFR 402.16? That's the reinitiation regulation. Is there discretion to change things? And is there new information or something else? And you don't inquire into whether this will ask you a question because there must have already been an action since the initial initiation of consultation occurred. Let me follow up on your explanation. So, in the first round, is EPA an issue to permit? And the plant operated for two years, and then EPA said, you know, they're wrong. It's a problem. I'm going to pull it apart, and you're done. And then six months later, PTA started up again and operated. Is that operating pursuant to the agency action that the agency action authorized originally? Well, it would be a moot question because if the plant we're operating illegally because it didn't have a permit, then, you know, I think it wouldn't just be forcing initiation of consultation. It would be forcing them to stop operating. Can you address that with the permit expiring pursuant to operating illegally, because they're operating under expired permit? How is that different? Well, they were operating under expired permit, and they were acting legally. There was the consent decree, which reimposed limitations. Some of them the same, some of them different. Prior to the consent decree, they were operating outside of the permit illegally, as you say. Right. That's what they were doing, authorized by the agency action, and it expired. It was authorized. What the EPA initially granted was that permission. Through a legal act, there was an intervening period, and then EPA, using the legal process, put those controls back into place. Yeah, so it doesn't matter that it was interrupted by some legal act. There could always be, if you can interrupt the Endangered Species Act by someone saying, well, we're just going to, you know, omit over our permit limit, or we're going to, you know, sneak around that. That would totally eviscerate the whole. So I would say that the re-initiation, the opposing counsel's characterized as, we're trying to impose some vague policy and only talking about statutory language, but agency counsel has never grappled with the re-initiation regulation, which is much different in terms of, it doesn't require an actual affirmative action. It only has about continuing discretion to take action and whether one of the four triggers has been met. The other thing, I think, the counsel has continued to not grapple with. In the difference between initiation and re-initiation, how are the cases? So the California sport fishing case is an initiation of consultation case. Again, there was never a consultation in that case. All the cases relied upon by EPA are where there was no initiation of consultation, and so you're requiring whether there was an affirmative action. Okay. Congresswoman, do you think that the fact that the government has discretion to re-initiate means that they can be compelled to do the initiation effort? What's your take on that? It's not just discretion to re-initiate consultations. It's discretion to take action that would change the on-the-ground situation to make it better. So it's not like the same as... I think we want to be careful not to... It's their discretion to institute and enforce the action. That's not what we're talking about. In a way, to me, it appears that you're seeking to compel them to insist discretion. No, because they don't have discretion whether or not to re-initiate consultation. They are required by the Act to re-initiate consultation if they retain discretion over the action in one of those four things. They don't have choices to whether to re-initiate consultation. They are required by law. The option to enforce their action is just maybe what came with previously, but I'm not sure that that's the same as if you have to re-initiate consultation. Well, I think the discretion to take enforcement actions is a red herring. It's a straw man. We don't allege that that has anything to do with it. It's that the discretion question doesn't go to the duty, you know, whether they have to or don't have to consult. It goes to do they have discretion if they aren't re-initiated and it's decided that changes need to be made on the ground. Do they have the discretion to make those changes? So in this case, it's admittedly due because they can reopen the consent decree if it's determined that stricter limitations are required. It's not a matter of is there discretion to take enforcement action, or is there discretion whether or not to consult the discretion. It really has to go to can they change something on the ground? So your view is there is no discretion. They are compelled to re-initiate a constitutional act of regulation. Yes. I understand. Oh, yeah. The control side, I have nothing more fun to hear from you. Look at him. He has wild equity versus EPA. And he does look simplified. He's a little specific in his analysis. He's trying to pick wild equity versus EPA. And he does have a few things to do with money matters. He's a good guy. He's a good guy. I love him. I think we're just as good as him.
judges: W. Fletcher, Rawlinson, Gordon